**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WAYNE HARTER; ROBERT PAYNE,
Plaintiffs-Appellees,

v.

C. D. VERNON, individually and in
his official capacity as Sheriff of

No. 96-1434

Rockingham County; ROCKINGHAM
COUNTY,
Defendants-Appellants,

GUILFORD COUNTY,
Movant.

Appeal from the United States District Court
for the Middle District of North Carolina, at Rockingham.
Frank W. Bullock, Jr., Chief District Judge.
(CA-95-75-3)

Argued: September 25, 1996

Decided: November 22, 1996

Before RUSSELL, NIEMEYER, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Niemeyer joined. Judge Russell concurred only in the
judgment.

_____

**COUNSEL**

**ARGUED:** James Redform Morgan, Jr., WOMBLE, CARLYLE,
SANDRIDGE & RICE, P.L.L.C., Winston-Salem, North Carolina,

for Appellants. Martha Anne Geer, PATTERSON, HARKAVY & LAWRENCE, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Melinda Lawrence, PATTERSON, HARKAVY & LAW-RENCE, L.L.P., Raleigh, North Carolina, for Appellees.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

The district court concluded that a sheriff in North Carolina is not a state official for purposes of Eleventh Amendment immunity. Because the state treasury would not pay any judgment against a sheriff and because the state would suffer no indignity to its sovereign integrity if immunity were not accorded to a sheriff, we affirm.

I.

The sheriff of Rockingham County, North Carolina, C.D. Vernon, hired Wayne Harter as a dispatcher in 1988; Vernon hired Robert Payne as a deputy sheriff in 1989. Five years later, in 1994, Vernon faced competition from a former deputy, Sam Page, for the Democratic nomination for sheriff. According to Harter and Payne, Vernon directly pressured his employees to campaign actively on his behalf, and to donate funds to his re-election. Sheriff's department employees were solicited for campaign contributions during shift meetings, and were told to post signs supporting Sheriff Vernon in their yards. Vernon assertedly threatened to discharge deputies after the primary if they failed to support him. Payne and Harter minimally supported Vernon's campaign. Payne donated ten dollars to the campaign, and did not vote. Harter told Sheriff Vernon that he supported him, but preferred not to campaign for him. Nonetheless, Vernon defeated his challenger in the primary election.

At approximately the time of the primary election, Sheriff Vernon began to investigate alleged wrongdoings by certain deputies. Vernon's investigation revealed that five members of Payne's work shift repeatedly failed to check-out with the dispatcher before taking their breaks. Vernon spoke to three of these deputies about their behavior,

2

and fired the other two -- Payne and Richard Lintecum -- without speaking to them. Payne and Lintecum were the only two of the five who did not support Vernon's campaign. The same investigation also assertedly unearthed difficulties with Harter's work, and Vernon discharged him as well. In all, Vernon fired Harter and Payne, and seven other employees. Harter and Payne allege that all of these employees failed to support Vernon's campaign. Harter and Payne also assert that they were never told that their job performance was "in any way inadequate."

On January 31, 1995, Harter and Payne filed suit against Rockingham County and Sheriff Vernon, in his individual and official capacities. Harter and Payne alleged violations of the United States and North Carolina Constitutions. The County and Vernon moved for summary judgment on all counts.

The district court granted summary judgment to the County on all claims, explaining that in its view, Vernon "was not acting pursuant to a policy of the County," and "under state law the sheriff is not an agent of the County in employment decisions." In addition, the court granted Vernon summary judgment on the constitutional claims asserted against him in his personal capacity. The court, however, held that the Eleventh Amendment did not bar claims against Vernon in his official capacity. The court reasoned that since it was uncontroverted that a judgment against the sheriff would not affect the state treasury, this factor "largely, if not wholly" disposed of any claim to immunity, and that other relevant factors also indicated that a North Carolina sheriff is not a state officer.

Vernon appealed; Harter and Payne did not cross appeal. Accordingly, the Eleventh Amendment ruling is the only issue presented for our review. We do not address, and express no opinion as to the correctness of, any of the district court's other holdings.

II.

Denial of summary judgment on the basis of Eleventh Amendment immunity is immediately appealable. Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144-47 (1993). We review questions of the applicability of Eleventh Amendment

3

immunity de novo. Ristow v. South Carolina Ports Auth., 27 F.3d 84, 86 (1994), vacated on other grounds, 115 S.Ct. 567 (1994).

The Eleventh Amendment provides: "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although by its terms the Amendment applies only to suits brought against a state by"Citizens of another State," it is well established that "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Puerto Rico Aqueduct, 506 U.S. at 144. This immunity applies to state agencies that may be properly characterized as "arm[s] of the State," Mt. Healthy City Board of Ed. v. Doyle, 429 U.S. 274, 280 (1977), as well as to state employees acting in their official capacity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

The Eleventh Amendment, however, affords no protection to local government entities and employees. Id. at 70. The crucial question, therefore, in many Eleventh Amendment cases is whether an agency or official is properly characterized as an arm of the state, or of the local government.

Vernon makes two principal arguments as to why the district court erred in holding that a North Carolina sheriff is not a state official for Eleventh Amendment purposes. First, he claims that the court followed the wrong test in determining whether a sheriff is an arm of the state because the court did not properly weigh the state's "sovereign integrity and dignity." Alternatively, Vernon asserts that even if the district court articulated the proper test, it applied that test incorrectly. We consider each argument in turn.

III.

The test employed in the Fourth Circuit for determining whether an agency or employee constitutes an arm of the state was first stated in Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm., 822 F.2d 456 (4th Cir. 1987). That case set forth a four-part, non-exclusive test for determining whether an entity is an alter ego of the

4

state. The first, and "most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." Ram Ditta, 822 F.2d at 457. The other three inquiries include, but are "not necessarily limited to,[1] whether the entity exercises a significant degree of autonomy from the state, [2] whether it is involved with local versus statewide concerns, and [3] how it is treated as a matter of state law." Id. at 457-58. (internal citations omitted). Ram Ditta made clear that "[a]lthough a federal court may consider how an entity is treated under state law,`the question of whether an agency is an alter ego of the state . . . is a question of federal, not state, law.'" Id. at 458 n. 5 (quoting Blake v. Kline, 612 F.2d 718, 722 (3rd Cir. 1979), cert. denied, 447 U.S. 921 (1979)).

This court continued to apply the Ram Ditta test until the Supreme Court's most recent Eleventh Amendment "arm of the state" case, Hess v. Port Auth. Trans-Hudson, ___, U.S. ___, 115 S.Ct. 394 (1994). Hess announced that Eleventh Amendment inquiries should be guided by the Eleventh Amendment's twin reasons for being: preventing judgments from depleting state treasuries, and maintaining "the integrity retained by each State in our federal system." Hess, 115 S.Ct. at 400, 404.

In Hess, the Court proceeded in two steps to find that the New York/New Jersey Port Authority was not to be regarded as a state entity entitled to Eleventh Amendment immunity. First, the Court considered "indicators" of state entities: whether local or state governance controlled the entity, whether the implementing legislation characterized the entity as a state agency and how state courts have ruled on the issue, whether the entity's functions have traditionally been regarded as state or local, and whether a state has financial responsibility for the entity. Id. at 402-3.

The Court found that these factors, which echo the factors articulated in Ram Ditta, pointed in opposite directions for purposes of determining the Eleventh Amendment immunity of the Port Authority. The Hess Court reasoned that when this is the case, a court must focus on "the impetus for the Eleventh Amendment: the prevention of federal court judgments that must be paid out of a State's treasury. . . . Accordingly, Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment

5

determinations." <u>Hess</u>, 115 S. Ct. at 404. Thus, <u>Hess</u> established that in making a determination as to entitlement to Eleventh Amendment immunity a number of factors must be considered, but that <u>Ram Ditta</u> was correct that the state treasury factor is the most important.

We recognized this in <u>Gray v. Laws</u>, 51 F.3d 426, 434 (4th Cir. 1995), holding that <u>Hess</u> had not "materially altered the Eleventh Amendment analysis we formulated in <u>Ram Ditta</u>," and that "the changes in our circuit's Eleventh Amendment analysis wrought by <u>Hess</u> [were] not significant. . . [but] neither [were] they inconsequential." Rather than articulating the particulars of the Eleventh Amendment inquiry in <u>Gray</u>, we remanded the case to the district court because it was "in the best position to address in the first instance the competing questions of fact and state law necessary to resolve the eleventh amendment issue." <u>Gray</u>, 51 F.3d at 434 (internal quotations omitted).

Although remand was entirely appropriate in <u>Gray</u> , leaving the particulars of the Eleventh Amendment analysis somewhat undefined has resulted in confusion among the district courts, including the split in the district courts in North Carolina as to the Eleventh Amendment immunity of North Carolina sheriffs. Three judges in the Eastern District of North Carolina have held that the Eleventh Amendment bars official capacity claims against a North Carolina sheriff, while judges in the Middle District and Western District have held that it does not. <u>Compare Braswell v. Ellis</u>, No. 5:94-CV-325-D3 (E.D.N.C. July 19, 1995) (Order Den. Mot. for Recons.) (holding a North Carolina sheriff to be a state actor and immune from official capacity suits under the Eleventh Amendment), <u>and Merritt v. Beckham</u> , No. 5:94-CV-462-BO(3) (E.D.N.C. Mar 8, 1995) (Order) (same), <u>and Edwards v. Sheriff Billy Smith</u>, 5:94-CT-24-BR (E.D.N.C. Sept. 22, 1994) (Order) (same), <u>with Harter v. Vernon</u>, No.3:95CV75 (M.D.N.C. March 22, 1996) (Memorandum Opinion) (holding that Sheriff is not a state official for Eleventh Amendment immunity purposes), <u>and Carter v. Good</u>, 4:94CV200 (W.D.N.C. June 7, 1996) (Memorandum Opinion) (same).**1**

_____

**1** Some of these cases also evidence confusion on one additional point -- whether a defendant state official can claim immunity from suit in

In light of this confusion we here explain more fully the appropriate process for determining whether an entity or official is an arm of the state for Eleventh Amendment purposes. As we have recognized in virtually all of our Eleventh Amendment jurisprudence, the most important factor is whether the state treasury will pay any resulting judgment. Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996); Gray, 51 F.3d at 433; Bockes v. Fields, 999 F.2d 788, 790-91 (4th Cir. 1993), cert. denied, 510 U.S. 192 (1994); Ram Ditta, 822 F.2d at 457. Recognizing this as the dominant inquiry in the courts of appeals, and "the correct legal theory," in Hess the Supreme Court noted that a finding that the state treasury will pay the judgment is usually "dispositive." Hess, 115 S. Ct. at 404-6.

In light of the importance of the state treasury factor, we held in Bockes, and reiterated in Gray, that if the state treasury will pay the judgment, the entity is immune from suit, and the other Ram Ditta factors need not be considered. Gray, 51 F.3d at 433-34 (citing Bockes, 999 F.2d at 790-91).

The state treasury factor is also significant when the state treasury will not pay the judgment. If that is the case, then"the most salient factor in Eleventh Amendment decisions" weighs against a finding of

_____

federal court because he is not "a person" under § 1983. "Personhood" vel non does not provide a basis for a state official to avoid suit in federal court. Rather, a defendant state official must plead Eleventh Amendment immunity. The Eleventh Amendment is a bar to the jurisdiction of a federal court, and as such, it precedes the statutory question of "personhood" under § 1983. Once the Eleventh Amendment inquiry is complete, there is no need to consider "personhood." If an official or entity is not immune from suit under the Eleventh Amendment that official or entity is a "person" subject to suit under § 1983. See Will 491 U.S. at 70-71 (holding that states, and state officials and entities, are not "persons" under § 1983 and stating "our holding here.. . applies only to States or governmental entities that are considered `arms of the State' for Eleventh Amendment purposes"). The opposite is also true, if the Eleventh Amendment applies, the entity or official is not a person under § 1983. Id. Therefore, federal courts should approach these issues solely under the rubric of the Eleventh Amendment, and should not consider an argument of "personhood" under § 1983.

7

immunity. Hess, 115 S. Ct. at 404. Although in that situation, a court should consider the other Ram Ditta factors, Hess makes clear that the impact on the state treasury is generally determinative when the state will not have to pay for a judgment: "If the expenditures of the enterprise exceed the receipts, is the state in fact obligated to bear and pay the difference? When the answer is `No' -- both legally and practically, then the Eleventh Amendment's core concern is not implicated." Id. at 406. Thus the district court correctly held that "a determination that the state treasury will be liable for a particular judgment is largely, if not wholly, dispositive of entitlement to Eleventh Amendment immunity."

Nevertheless, Vernon argues that the state treasury factor is only determinative if the state will pay; he claims that if the state is not responsible for the judgment, the sovereign dignity of the state becomes the determinative factor. Vernon relies on the Supreme Court's recent discussion of state sovereignty in Seminole Tribe of Florida v. Florida, ___ U.S. ___, 116 S. Ct. 1114 (1996), and Hess itself; neither case provides support for Vernon's theory.

Seminole Tribe held Congress has no power under Article III of the Constitution to abrogate the Eleventh Amendment immunity of a state; the case had nothing to do with who the Eleventh Amendment applies to. Rejecting the petitioner's argument that Congress has power to abolish a state's Eleventh Amendment immunity when an "Act authorizes only prospective injunctive relief rather than retroactive monetary relief," the Court held that the choice of remedy -- damages or prospective relief -- has no effect on Congressional power. Seminole Tribe, 116 S. Ct. at 1124. In the course of this discussion the Court stated that "[t]he Eleventh Amendment does not exist solely in order to `preven[t] federal court judgments that must be paid out of a State's treasury,' Hess v. Port Authority, Trans-Hudson Corporation, 115 S. Ct. 394, 404 (1994); it also serves to avoid the indignity of subjecting a State to the coercive process of judicial tribunals. . . ." Seminole Tribe, 116 S. Ct. at 1124 (parallel citations omitted). This is certainly true, but contrary to Vernon's suggestion, this one sentence quotation of Hess for a black letter rule of Eleventh Amendment law does not address what entities are subject to the Eleventh Amendment, and does not overrule, or even undercut, the Court's explicit holding in Hess two years earlier.

8

Moreover, Vernon's reliance on <u>Hess</u> for the proposition that the state treasury factor is only crucial if the state will pay the judgment (and not if the state will not pay it) is misplaced. <u>Hess</u> itself renders that argument untenable. The <u>Hess</u> Court made no distinction between cases where the state treasury would be affected and those in which it would not be affected, in holding the state treasury factor "dispositive." <u>Hess</u>, 115 S. Ct. at 405. Instead, the Court cited with approval a number of cases holding that if a state would not be liable for the judgment, the Eleventh Amendment does not apply. <u>Id.</u> at 404-5 (citing and quoting <u>Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer Auth.</u>, 991 F.2d 935, 942-43 (1st Cir. 1993) ("First, and most fundamentally [the entity's] inability to tap the Commonwealth treasury or pledge the commonwealth's credit leaves it unable to exercise the power of the purse. On this basis, [the entity] is ill deserving of Eleventh Amendment protection"); <u>Barkett, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.</u>, 948 F.2d 1084, 1087 (8th Cir. 1991) ("Because Missouri and Illinois are not liable for judgments against Bi-State, there is no policy reason for extending the states' sovereign immunity to Bi-State."). Perhaps most significantly, <u>Hess</u> itself concerned a suit where state treasuries were not responsible for the judgment, and treated the state treasury factor as critical in denying Eleventh Amendment immunity. <u>Id.</u> at 406. The court could not have done this if, as Vernon maintains, the state treasury factor is only critical when the state is responsible for a judgment.

Vernon's theory is also contrary to our case law and to logic. Vernon asserts that when the state treasury will <u>not</u> be responsible for a judgment, the sole consideration becomes whether the state's "integrity" will be injured by any judgment and he treats the "integrity" factor as if it requires an inquiry separate from examination of the <u>Ram Ditta</u> factors. Our decision in <u>Gray</u> established that <u>Hess</u> did not "materially alter[ ] the Eleventh Amendment analysis we formulated in <u>Ram Ditta</u>." <u>Gray</u>, 51 F.3d at 434. We recognize that "the sovereign dignity of the states" is a principal concern of the Eleventh Amendment, <u>Gray</u>, 51 F.3d at 432, but the possible harm to a state's sovereign dignity is not a separate, free-floating factor outside of the <u>Ram Ditta</u> considerations. Instead, we utilize the <u>Ram Ditta</u> factors to measure whether the sovereign dignity of a state would be affected by a suit against an entity or official.

9

In sum, when determining if an officer or entity enjoys Eleventh Amendment immunity a court must first establish whether the state treasury will be affected by the law suit. If the answer is yes, the officer or entity is immune under the Eleventh Amendment. Bockes, 999 F.2d at 790-91. If the answer is no, the most decisive factor weighs against Eleventh Amendment immunity, but the court should also consider the other three Ram Ditta factors.

Because Vernon also challenges the district court's application of the other Ram Ditta factors, we now turn to that issue.

IV.

The four Ram Ditta factors are "whether the state treasury will be responsible for paying any judgment that might be awarded . . . . [W]hether the entity exercises a significant degree of autonomy from the state, whether it is involved with local versus statewide concerns, and how it is treated as a matter of State law." Ram Ditta, 822 F.2d at 457-58. The inquiry begins with the first factor, because "the most important consideration is whether the state treasury will be affected." Id. at 457. It is undisputed that North Carolina does not have to satisfy judgments against sheriffs. Because the "state treasury will not be affected" by any such judgment, we examine the remaining Ram Ditta factors, keeping in mind that the most important consideration weighs against immunity.

A.

As to the degree of a sheriff's autonomy from or control by the state, Vernon is correct that North Carolina exercises considerable authority over the office of sheriff. The State Constitution creates the office. N.C. Const. art. VII, § 2. North Carolina statutes set the sheriff's term of office, N.C. Gen. Stat. § 162-1 (1995) (sheriff to serve a four year term), and the qualifications for office. § 162-2. North Carolina statutes also require the sheriff to perform multiple duties, for example, the duty to receive and execute process, § 162-13 to -14, the duty to keep the county jail, § 162-22 to -23, and the duty to issue concealed weapons permits. § 14-415.10 to 14-415.23.

10

Vernon ignores, however, a series of indicia suggesting substantial county control of sheriffs. Residents of a county elect their sheriff. N.C. Const. art. VII, § 2; N.C. Gen. Stat.§ 162-1. The Board of County Commissioners determines the number of salaried employees in the sheriff's office. § 153A-103. The county sets and pays the salaries of a sheriff and his deputies and the county determines and pays the overall budget. §§ 153A-103, 153A-9. If a vacancy arises in the position of sheriff, either by resignation or removal, the Board of County Commissioners appoints a new sheriff for the remainder of the sheriff's term. § 162-5. A petition for removal of a sheriff is prosecuted by the county attorney, § 128-17, before a judge of the Superior Court in the county where the sheriff resides.§ 128-16. If a sheriff resigns, he forwards his resignation to the county commissioners. § 162-3. Sheriffs must also furnish a bond to the county commissioners, with the amount of the bond set by the commissioners. § 162-8.**2**

Therefore, county government controls many significant aspects of North Carolina sheriffs' employment. County residents hire the sheriff (through election), the county government sets their pay, the county provides for the number of deputies, and the county attorney is the official with the power to move to dismiss the sheriff. In contrast, no state agency or official oversees the activities of sheriffs.

_____

**2** These statutes supply some of the reasons why Vernon's reliance on Cromer, 88 F.3d 1315, is misplaced. In Cromer we held that South Carolina sheriffs were state officials for Eleventh Amendment purposes. However, in South Carolina, unlike North Carolina, the state legislature provides for the sheriff's compensation. S.C. Const. art. V, § 24. See S.C. Code Ann. §§ 23-11-10 et seq. (Law Co-op 1994). Moreover, the South Carolina governor, unlike the North Carolina governor, is the public official empowered to remove a sheriff from office for misconduct and to fill a vacancy in the sheriff's office. S.C. Code Ann.§§ 1-3-240 and 23-11-40 (Law Co-op 1994). South Carolina also mandates training for its sheriffs within the first year of their elected terms. § 23-11-110(C). North Carolina does not require training for "the Sheriff elected by the people." N.C. Stat. § 17E-11(a) (1995). Finally, and most significantly, while in Cromer we could not discern whether the South Carolina treasury would pay for some, or all, of a resulting judgment, in this case it is undisputed that the North Carolina treasury will not pay any judgment.

11

A sheriff also has significant autonomy from both the state and the county in the performance of his duties. For example, the sheriff has freedom "to hire, discharge and supervise the employees in his office." N.C. Gen. Stat. § 153A-103(1). **3**

The question of the autonomy of a sheriff is mixed. Although a sheriff's duties are set forth in a number of North Carolina statutes, the individual county in which a sheriff serves exercises significant control over him, and the sheriff also enjoys considerable autonomy from both state and county control. This factor does not weigh strongly in either direction.

B.

We next consider "whether [the entity] is involved with local versus statewide concerns." Ram Ditta, 822 F.2d at 458. In Hess the Supreme Court inquired whether an entity's functions are "classified as typically state or unquestionably local." Hess, 115 S.Ct. at 403.

It has long been understood that a sheriff is a"law enforcement officer of the county." Southern Ry. Co. v. Mecklenburg County, 56 S.E.2d 438, 440 (N.C. 1949). See also Webster's Third New Int'l Dictionary 2094 (3d ed. 1993) (defining sheriff as"an important county officer in the U.S."); Black's Law Dictionary 1376 (6th Ed. 1990) (defining sheriff as "[t]he chief executive and administrative officer of a county."). Sheriffs have been considered county officers

_____

**3** In finding that Vernon was not a state official the district court focused on the sheriff's autonomy in employment decisions, because "[t]he inquiry must focus narrowly on the actions alleged since the sheriff may be a state officer for some purposes, but not others." We note that in Gray we warned against using this type of"functional" approach:

> While it is true that whether a judgment against an official is payable from the state treasury on occasion may depend upon the function being performed by the official at the time of the alleged illegal conduct, the primary consideration for Eleventh Amendment immunity is whether the state is liable for the judgment against the employee, not the function performed by the employee.

Gray, 51 F.3d at 435.

12

from the creation of that office in England. "The title sheriff is said to be derived from the Saxon word `seyre,' a shire or county, and `reeve,' bailiff or keeper; the `seyre-reeve' or bailiff of a county." 39 Words and Phrases 246 (quoting Commonwealth v. Cluley, 56 Pa. 270, 275 (1867)).

It is true that sheriffs are involved in state concerns, notably enforcing state laws, and performing multiple duties for the benefit of the state. But, generally a sheriff may only enforce these laws, or perform these duties, within a given county. Furthermore, a sheriff is ultimately elected by a county, and responsible to the county.

The office of the sheriff has generally been involved with local rather than state concerns; its functions are typically local. Thus, this factor weighs against Eleventh Amendment immunity.

C.

The last factor involves "how [the entity] is treated as a matter of state law." Ram Ditta, 822 F.2d at 458.

This factor has engendered great confusion. Some cases have mistakenly treated a state court decision as to whether an entity is a state actor as determinative. See, e.g. Levinson-Roth v. Parries, 872 F.Supp. 1439, 1447 (D. Md. 1995) (according Eleventh Amendment immunity to Maryland sheriffs because "[t]he Court determines the status of Sheriff Kight and Deputy Popkin by referring to Maryland law."); Gulledge v. Smart, 1989 WL 69302, **2 (4th Cir., June 19, 1989) (relying solely on a South Carolina state court case to find sheriff immune under the Eleventh Amendment). In fact,"the question of whether an agency is . . . immune from federal jurisdiction under the Eleventh Amendment is a question of federal, not state, law." Ram Ditta, 822 F.2d at 458 n. 5.

As a matter of federal law, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question. See Hess, 115 S.Ct. at 403 (examining both the relevant state statutes, and the decisions of state courts); Mt. Healthy City Board of Ed. v. Doyle,

13

429 U.S. 274, 280-81 (1977) (examining state statutes); Gray, 51 F.3d at 435-37 (examining state statutes and a state court ruling). A federal court may "give deference to the rationale used by a state court," but the holding is not dispositive as a matter of federal law. Ram Ditta, 822 F.2d at 460. See also Gray, 51 F.3d at 437 (cautioning district court against overreliance on a state court decision if "there is no reasoning provided for the [state] court's conclusion").

Vernon argues that because North Carolina courts have twice held that a sheriff is a state official we are bound by those decisions. See Messick v. Catawba County, 110 N.C. App. 707, 713-14, 431 S.E.2d 489, 493 (N.C. Ct. App. 1993), disc. review denied, 334 N.C. 621, 435 S.E.2d 336 (N.C. 1993) (dismissing § 1983 official capacity claim against a sheriff); Slade v. Vernon, 110 N.C.App. 422, 429 S.E.2d 744 (N.C. Ct. App. 1993) (same). As we did in Gray, we find the proffered state court holdings here unpersuasive in view of the fact that neither was decided by the state's highest court, and "there is no reasoning provided for [either] court[s'] conclusion." Gray, 51 F.3d at 437. We find more instructive another North Carolina case, Hull v. Oldham, 104 N.C. App. 29, 41, 407 S.E.2d 611, 618 (N.C. Ct. App. 1991), disc. review denied, 330 N.C. 441, 412 S.E.2d 72 (N.C. 1991), which discussed the relevant sections of the North Carolina Constitution and held that a sheriff is a local official.

Nonetheless, Vernon argues that if we do not follow Messick and Slade, we will violate the dignity of North Carolina. This is simply incorrect. When this court has ruled on an issue of North Carolina law in a diversity case, we lose no dignity if a North Carolina court disagrees and corrects us. Our holdings on questions of state law do not bind state courts, nor do state court determinations on questions of federal law control us.

The relevant state constitutional and statutory provisions indicate that sheriffs in North Carolina are not state officials. The North Carolina legislature itself has provided that "[t]he sheriff is the only officer of local government required by the Constitution." N.C. Stat. § 17E-1 (1995) (emphasis added). The office of sheriff is created under Article VII of the North Carolina Constitution, entitled"Local Government." N.C. Const. art. VII, § 2. See Hull v. Oldham, 104 N.C. App. at 41, 407 S.E.2d at 618. As discussed within, North Carolina statutes pro-

14

vide the county with control over many relevant aspects of the sheriff's employment and also permit sheriffs considerable autonomy.

Thus, examination of the relevant constitutional and legislative provisions and the better reasoned case law lead us to conclude state law treats sheriffs as local officials. The state law factor also weighs against Eleventh Amendment immunity.

V.

In sum, the Eleventh Amendment does not bar a suit against a North Carolina sheriff in his official capacity. The North Carolina treasury will be unaffected by any judgment against a sheriff, and the other three Ram Ditta factors are either equivocal, or militate toward denial of immunity. The order of the district court denying Eleventh Amendment immunity to Sheriff Vernon is hereby

AFFIRMED.

15